COURT OF APPEALS
DECISION
DATED AND FILED

July 23, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP559**

Cir. Ct. No. **2020CV9**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT IV

---

THOMAS J. BUCHER, JR.,

   PLAINTIFF-APPELLANT,

 V.

JOHN H. SHORE AND PAIGE M. SHORE,

   DEFENDANTS-RESPONDENTS.

---

APPEAL from a judgment of the circuit court for Marquette County: CHAD A. HENDEE, Judge. *Affirmed*.

Before Graham, P.J., Kloppenburg, and Nashold, JJ.

¶1   KLOPPENBURG, J. In this appeal, Thomas J. Bucher, Jr., challenges the circuit court's resolution, after a bench trial, of various claims by Bucher and counterclaims by John H. Shore and Paige M. Shore (collectively, the Shores) concerning the parties' rights to, and conduct on, their neighboring

properties. Specifically, Bucher argues that the court erred when it entered an amended and restated judgment that purportedly misrepresents its decision regarding the Shores' easement over a portion of Bucher's property. Bucher also argues that the court erred when it decided the parties' claims and counterclaims contrary to the evidence and the law by: declaring that the Shores' easement rights extend over the portion of Bucher's property determined in the amended and restated judgment; granting the Shores' prescriptive easement counterclaim; dismissing Bucher's trespass claim; and granting the Shores' private nuisance counterclaim. Bucher further argues that the court erred when it granted a punitive damages award on the Shores' private nuisance counterclaim that is factually unsupported and unconstitutionally excessive. We reject Bucher's challenges and affirm.

## BACKGROUND

¶2    The following facts are derived from the testimony and exhibits introduced during a three-day bench trial, from the circuit court's written decision, which includes findings of fact and conclusions of law, and from the court's amended and restated judgment.

¶3    The parties currently own neighboring parcels of land abutting Wood Lake in Marquette County. The parcels were created in 1959 when what was then known as "Lot 8" was divided into two halves: the northwest half presently owned by Bucher (the "Bucher Parcel"); and the southeast half presently owned by the Shores (the "Shore Parcel"). When Lot 8 was split in two in 1959, the deed specified that the owner of the Shore Parcel "retains a right of way access through the [Bucher Parcel] to the [Shore Parcel]." We refer to this deeded right of way as "the Access Easement in the 1959 deed" or simply "the Access

Easement." Bucher has owned the Bucher Parcel since 2013, and the Shores have owned the Shore Parcel since 2017.

¶4 Both parcels are bordered by Fifth Drive to the west and Wood Lake to the east. The Shore Parcel is accessed by a dirt driveway that goes through the Bucher Parcel from Fifth Drive and opens onto a grassy clearing on the Bucher Parcel referred to as the "side yard." The Shore Parcel abuts the southern edge of the side yard. The lake is on the eastern edge of the side yard, and the western edge of the side yard is lined with shrubs and referred to as "the brush line."

¶5 Before the Shores purchased the Shore Parcel, Bucher discussed the Access Easement over the Bucher Parcel with the previous owner of the Shore Parcel, Doug Gondek. Bucher did not want the Access Easement to remain on his property through the side yard, but he and Gondek were unable to come to an agreement regarding any change to the Access Easement. When Gondek put the Shore Parcel up for sale, Bucher put up stakes and "no trespassing" signs and parked a trailer to block access from the side yard to the Shore Parcel. After the Shores purchased the Shore Parcel, Bucher removed the trailer and installed a fence, painted lines on the ground, and planted a row of arborvitae trees in the area of the boundary between the side yard and the Shore Parcel. When these obstructions were present, the Shores parked on the side yard rather than next to their cottage on the Shore Parcel.

¶6 In 2020, Bucher filed this lawsuit against the Shores, alleging that the previous owners of the two parcels had established the Access Easement to be a path on the dirt driveway and through the part of the side yard closest to the brush line and that the Shores had deviated from this path by using the entire side yard. Pertinent to this appeal, Bucher alleged the following causes of action:

3

declaration of interest regarding the location of the Access Easement, and trespass as to the Shores parking on the side yard on the Bucher Parcel.[1]

¶7    The Shores alleged the following counterclaims: adverse possession, either of the entire Bucher Parcel or only of the entire side yard; prescriptive rights over the Access Easement as comprising the dirt driveway and entire side yard, including using the entire side yard for access and parking; trespass as to Bucher's placing stakes, a fence, trees, and his trailer allegedly on the Shore Parcel; and private nuisance as to Bucher's placing obstructions allegedly on the Shore Parcel and engaging in other allegedly harassing activities.

¶8    A jury trial began in October 2022, but on the second day of trial the circuit court declared a mistrial due to discovery violations by Bucher. A court trial was then held over the course of three days in October 2024 as to the following remaining claims: (1) Bucher's declaration of interest claim as to the location of the Access Easement; (2) Bucher's trespass claim regarding the Shores parking on the side yard; (3) the Shores' adverse possession counterclaims for the entire Bucher Parcel or, alternatively, for only the side yard; (4) the Shores' prescriptive rights counterclaim over the Access Easement comprising the dirt driveway and the entire side yard; (5) the Shores' trespass counterclaim; and (6) the Shores' private nuisance counterclaim.

¶9    Because the issues on appeal overlap in terms of the pertinent facts, we relate the testimony presented at the court trial in some detail as follows.

---

[1] Bucher also alleged and then dismissed before trial several claims that are irrelevant to the issues on appeal, concerning the Shores' purported diversion of water from the Shore Parcel onto the Bucher Parcel.

¶10     Deborah Austin testified as follows.  Between 1999 and 2003, Austin was in a relationship with Jeff Holland, who owned the Shore Parcel until his death in 2003.  While they were dating, Austin and Holland went to the cottage on the Shore Parcel a few times a week in the summers and less frequently in the winters.  When driving to the cottage, Austin, Holland, and their family members and guests typically drove through the middle of the side yard and did not try to stay close to the brush line.  When the side yard was wet, people drove on the area of the side yard closer to the lake, farther from the brush line.  People typically parked facing the steps of the cottage, adjacent to the side yard, but they also frequently parked on the side yard.  Holland frequently used the side yard for various activities and "just used it as his own."

¶11     Mary Maurer testified that she was in a relationship with Jeff Holland from 1993 to 2001.  Maurer and Holland spent a lot of time at the cottage on the Shore Parcel year-round.  Maurer, Holland, and their family and guests drove through the entire side yard to access the cottage.  When it was wet, people drove on the area closer to the lake because it was drier.  People drove through the side yard and parked freely in the area, "however … they wanted to."  People typically parked facing the steps of the cottage, adjacent to the side yard.  Holland used the side yard "very freely as if it were his own."

¶12     Ida Bucher, Bucher's mother, testified that she was at the cabin on the parcel adjacent to the Bucher Parcel nearly every weekend from spring through fall from approximately 1969 to 2002.  When Holland and his guests drove to the Shore Parcel, they drove across the side yard "[r]ight next to the bushes," and Ida never saw anyone drive anywhere else on the side yard.  Holland and his guests also parked "right in front of the [Shore] cabin," and Ida never saw Holland or anyone else park on the side yard.

¶13    Doug Gondek, who owned the Shore Parcel after Jeff Holland and before the Shores, testified as follows.  Gondek visited the cottage on the Shore Parcel numerous times when it was still owned by Holland.  When driving to the cottage, Gondek, Holland, and their guests cut across the side yard and parked facing the cottage steps, adjacent to the side yard.  Holland wanted his guests to drive closer to the lake and farther from the brush line, since the brush line area was wetter if it rained and the grass got "torn up."  People also parked on the side yard.  While Gondek owned the Shore Parcel, he and his guests approached the cottage the same way, cutting across the side yard closer to the lake when the side yard was wet.  Gondek and his guests also parked next to the cottage or on the side yard.  Gondek, like Holland, used the side yard freely like it was his own.

¶14    Gondek and Bucher had numerous conversations about moving the Access Easement, but Bucher wanted the entire Access Easement to be removed from the Bucher Parcel so that ingress and egress between Fifth Drive and the Shore Parcel would be entirely on the Shore Parcel, which was not acceptable to Gondek.  Bucher did not want Gondek to use the Access Easement, and a builder told Gondek that he would not work on the Shore Parcel until the Access Easement issue was resolved.  Gondek decided to sell the Shore Parcel because he determined that he would not be able to build on it as he wanted due to Bucher's issues with the Access Easement.  While Gondek was trying to sell the Shore Parcel, Bucher put up signs and parked a trailer in a way that blocked Gondek's access from the side yard to the cottage.

¶15    David Wright, the previous owner of the Bucher Parcel who sold it to Bucher, testified as follows.  His family owned the Shore Parcel when he was a child, and he later owned the Bucher Parcel.  When visiting the Shore Parcel as a child in the 1960s to the mid-1970s, his family typically crossed the side yard on

the area farther from the lake, closer to the brush line. When Wright later owned the Bucher Parcel, he never specified to the subsequent owners of the Shore Parcel, Holland or Gondek, any particular path they or their guests needed to drive to access the Shore Parcel. Wright also never gave anyone permission to use the Bucher Parcel for any activities other than accessing the Shore Parcel.

¶16    Bucher testified as follows. When he purchased the Bucher Parcel in 2013, Bucher was aware of the Access Easement to the Shore Parcel in the 1959 deed. Bucher had several conversations with Gondek about moving the Access Easement, but no agreement was ever reached. While Gondek was selling the Shore Parcel, Bucher installed stakes and no trespassing signs and parked his trailer at what he believed was the border of the side yard and the Shore Parcel. Bucher believed that the Access Easement required people to drive on the area closest to the brush line to access the Shore Parcel.

¶17    After the Shores purchased the Shore Parcel, Bucher installed a fence and painted an orange line on the ground at what he believed was the edge of the side yard, with the only opening directly next to the brush line. John Shore eventually removed the fence, and Bucher redrew the orange line. The line he redrew was "possibly" on the Shore Parcel, based on the location of a light post that was previously determined to be on the Shore Parcel. Bucher also planted several trees on what he believed was the edge of the side yard (the "arborvitae"), approximately where the fence had been. To determine where to put the arborvitae, Bucher used the placement of an existing wooden stake, which was later determined to be a stake on the Shore Parcel marking the ten-foot setback on the Shore Parcel. The Shores' practice of parking "everywhere" on the side yard occurred only after Bucher put in the fence and painted the orange line, not before.

7

After the Shores installed a camera on the Shore Parcel, Bucher installed four cameras on the Bucher Parcel.

¶18    Bucher testified about various text message exchanges with other family members and with Lori Killian, who owns the property to the south of the Shore Parcel.

¶19    Killian testified as follows.  Bucher considered the Shores his "enemies" and referred to John Shore in derogatory terms.  Bucher was upset that the Shores were parking on the side yard on the Bucher Parcel.  Historically, the Gondeks hugged the brush line when driving through the side yard and parked by the steps of the cottage on the Shore Parcel.

¶20    John Shore testified as follows.  When the Shores purchased the Shore Parcel, he was aware of the Access Easement in the 1959 deed.  Also when the Shores purchased the Shore Parcel, there were stakes on the parcel marking the ten-foot setback determined by a survey arranged by Gondek.  One stake had writing on it that said "ten-foot setback."  In June 2018, Bucher painted orange lines on the ground and installed a fence in the area where the Shore Parcel abuts the side yard.  The orange lines went up to the brush line, while the fence had an opening directly next to the brush line.  The fence prevented the Shores from using the full width of the side yard to access their cottage as needed when the side yard was wet.  When the side yard was wet, it became muddy and it was difficult to drive next to the brush line.  The painted line and the fence were placed at the ten-foot setback stakes on the Shore Parcel.

¶21    When Bucher later planted the arborvitae, there were stakes marking the lot line between the Shore Parcel and the Bucher Parcel, and the arborvitae were partially planted past the lot line on the Shore Parcel.  The arborvitae,

together with the fence, prevented the Shores from using most of the side yard to access their property and from parking in front of the steps of their cottage on their property as they normally did when there were no obstructions, so they sometimes parked on the side yard on the Bucher Parcel behind the arborvitae. No one in the Shore family ever parked on the side yard on the Bucher Parcel when there were not obstructions there. They also normally used the entire side yard to access the Shore Parcel, since water made it difficult to drive next to the brush line at times. Driving through the wet side yard also created mud, and they tried to avoid driving the same path more than once so as to not get stuck. The entire side yard was necessary to provide access to and from the Shore Parcel because water showed up in different places, and they had to drive on different parts of the side yard based on the weather and ground conditions.

¶22 John Shore observed Bucher's wife and other members of Bucher's family taking photographs of him "repeatedly," which was "disturbing." The presence of the cameras installed by Bucher facing the Shore Parcel, as well as Bucher and his family repeatedly taking photographs of the Shores, were "very unnerving" and "unsettling." The Shores bought the Shore Parcel for "rest and solitude," but the Buchers had been a constant negative presence. Bucher's behavior materially affected the Shores' future plans for the property, as they were never sure what reaction Bucher would have to any actions they took on the Shore Parcel. The Shores' children no longer want to go to their cottage, and they were never able to have the property be a place they "could call [their] own home."

¶23 Paige Shore testified as follows. When the Shores purchased the Shore Parcel, she was not informed that they had to park or drive through the side yard to the cottage on their property in any particular way. When there was significant rainfall, they were not able to drive by the brush line and had to drive

9

in the middle or more towards the lake side of the side yard. Since the Shores purchased the Shore Parcel, she has felt repeatedly violated by the presence of the four cameras on the Bucher Parcel facing her property, as well as by seeing Bucher and his family members taking photographs of her family. One of Bucher's cameras on the Bucher Parcel faces directly into the Shores' bedroom. The Shores' children do not want to visit the property or stay there alone, and she herself does not feel comfortable there.

¶24 Randy Douglas, a civil engineer, testified about a report that he had prepared for the Shores. The Shores hired Douglas to evaluate the drainage on the Shore Parcel as well as potential encroachment and trespass by Bucher on the Shore Parcel. Douglas reviewed aerial topography photographs as well as Geographic Information Systems mapping and data on Marquette County's website. Due to varying elevation on the Bucher Parcel and the Shore Parcel, water tends to collect in an area farther from the lake, near the brush line of the side yard. The area of the side yard closest to the lake is a higher ridge and does not collect water.

¶25 After post-trial briefing by the parties, the circuit court issued a written decision. The court dismissed the Shores' adverse possession claims based on the Shores' failure to prove all of the elements of those claims. The court determined that it was undisputed that the Access Easement includes the 14-foot-wide dirt driveway between Fifth Drive and the side yard. The court further determined that the Access Easement includes use of the entire side yard, but only for the purposes of ingress and egress, and that the Shores had proven that they have prescriptive rights to use the entire side yard for only those purposes. The court dismissed Bucher's trespass claim regarding the Shores parking on the side yard based on its finding that the Shores only parked there after Bucher's

obstructions made it impossible to park next to the cottage as the Shores normally would. The court granted the Shores' trespass claim based on its finding that the fence, orange lines, and three arborvitae and part of a fourth arborvitae are on the Shore Parcel. The court also granted the Shores' private nuisance claim based on its findings that Bucher engaged in a concerted effort of continued monitoring and harassment, evidenced by his placement of obstructions on, and a camera close to, the Shores' property line and his coordinated derogatory communications with others about the Shores, and that these combined efforts interfered with the Shores' ability to enjoy their property. The court further found that this interference was "extreme and outrageous."

¶26 In addition to determining the location of the Access Easement as including the dirt driveway and entire side yard, the circuit court ruled that the Shores may not clear any additional area around the side yard but may complete any maintenance to keep the current area clear. The court further ruled that the Shores may improve the easement on the side yard in an area limited to a 14-foot-wide path along the brush line, and that if the Shores wish to improve the path with driveway material, they must submit a proposed survey showing the designated path for court approval. The court also ruled that the Shores may remove any arborvitae planted by Bucher and restore the area to a grass lawn, at the Shores' own expense. The court awarded compensatory damages to the Shores in the amount of $20,000 and punitive damages in the amount of $250,000.

¶27 The circuit court entered a judgment consistent with its written decision. Bucher filed a motion for reconsideration, which the court granted in part only as to the punitive damages award. The court entered an amended and restated judgment that specifically described the location of the Access Easement with references to the recorded plat and tax key numbers; provided that its use is

11

limited to ingress and egress, including maintenance as needed to keep the area clear but no additional clearing, with improvements limited to a 14-foot-wide path along the brush line; and provided that the Shores may remove the arborvitae planted by Bucher at the Shores' expense and, if they do, shall restore the area to a grass lawn. The amended and restated judgment also reduced the punitive damages award to $200,000 and awarded the Shores their statutory costs and disbursements.

¶28 Bucher appeals.

## DISCUSSION

¶29 All of Bucher's arguments on appeal challenge the circuit court's decisions after a bench trial. We review a circuit court's decisions after a bench trial under a well-established standard. Our review is highly deferential to the court's findings of fact. *Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶11, 290 Wis. 2d 264, 714 N.W.2d 530. "On review of a factual determination made by a [circuit] court without a jury, an appellate court will not reverse unless the finding is clearly erroneous." *Noll v. Dimiceli's, Inc.*, 115 Wis. 2d 641, 643, 340 N.W.2d 575 (Ct. App. 1983) (citing WIS. STAT. § 805.17(2) (1981-82)).[2] "A circuit court's findings of fact are clearly erroneous when the finding is against the great weight and clear preponderance of the evidence." *Royster-Clark, Inc.*, 290 Wis. 2d 264, ¶12; *see also Figliuzzi v. Carcajou Shooting Club*, 184 Wis. 2d 572, 589 n.7, 516 N.W.2d 410 (1994) (Whether a factual finding is clearly erroneous is

---

[2] All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

identical to whether the finding is contrary to the great weight and clear preponderance of the evidence.).

¶30    "'[When] there is conflicting testimony, the trial judge is the ultimate arbiter of the credibility of the witnesses,'" ***Noll***, 115 Wis. 2d at 644 (quoted source omitted), and it is within the circuit court's discretion to determine "the weight to be given to each witness's testimony," ***State v. Peppertree Resort Villas, Inc.***, 2002 WI App 207, ¶19, 257 Wis. 2d 421, 651 N.W.2d 345.  We will not set aside a fact found by the circuit court unless, after accepting all credibility determinations made and reasonable inferences drawn by the court, the great weight and clear preponderance of the evidence support a contrary finding.  ***Noll***, 115 Wis. 2d at 643-44.

¶31    "'This court reviews conclusions of law independently and without deference to the decision of the circuit court.'" ***Royster-Clark, Inc.***, 290 Wis. 2d 264, ¶13 (quoted source omitted).

¶32    This appeal also concerns an easement.  "An easement 'is a permanent interest in another's land, with a right to enjoy it fully and without obstruction.'" ***Konneker v. Romano***, 2010 WI 65, ¶25, 326 Wis. 2d 268, 785 N.W.2d 432 (quoted sources omitted).  The dominant estate—here, the Shore Parcel—"enjoys the privileges granted by the easement," and the servient estate—here, the  Bucher Parcel—"permits the exercise of those privileges." *See **id.*** While there are several types of easements, this case involves an express easement, that is, an easement created by a written grant or reservation of property rights. *See **AKG Real Est., LLC v. Kosterman***, 2006 WI 106, ¶15 & n.4, 296 Wis. 2d 1, 717 N.W.2d 835; ***Mnuk v. Harmony Homes, Inc.***, 2010 WI App 102, ¶24, 329 Wis. 2d 182, 790 N.W.2d 514.  "'Every easement carries with it by

implication the right … of doing whatever is reasonably necessary for the full enjoyment of the easement itself.'" *Atkinson v. Mentzel*, 211 Wis. 2d 628, 640, 566 N.W.2d 158 (Ct. App. 1997) (quoted source omitted; alteration in original).

¶33 As stated, the easement here provides that the Shore Parcel "retains a right of way access through the [Bucher Parcel] to the [Shore Parcel]." Such an easement "necessarily implies the right to create and maintain a suitable access way." *See Hunter v. Keys*, 229 Wis. 2d 710, 719, 600 N.W.2d 269 (Ct. App. 1999). "'If a location is not selected by either the servient or the dominant owner and they cannot agree upon a location, a court of equity has the power affirmatively and specifically to determine the location of the servitude.'" *Werkowski v. Waterford Homes, Inc.*, 30 Wis. 2d 410, 417, 141 N.W.2d 306 (1966) (quoted source omitted); *see also Spencer v. Kosir*, 2007 WI App 135, ¶13, 301 Wis. 2d 521, 733 N.W.2d 921 ("When the location of an easement is not defined, the court has the inherent power to affirmatively and specifically determine its location, after considering the rights and interests of [the] parties."). The court cannot act arbitrarily and must proceed with due regard for the rights of the parties. *Werkowski*, 30 Wis. 2d at 417. This determination as to the location of an easement is reviewed for an erroneous exercise of discretion. *Spencer*, 301 Wis. 2d 521, ¶13.

¶34 We address Bucher's arguments in turn.

## I. Amended and Restated Judgment

¶35 Bucher argues that the amended and restated judgment (amended judgment) misrepresents the circuit court's trial decision and order for judgment (decision) and, therefore, that the decision controls. Bucher appears to be arguing that the court does not in its decision actually decide his declaration of interest

14

claim, and so the portion of the amended judgment that defines the location of the Access Easement must be "disregarded," but the specifics of his argument are difficult to understand. In any event, his argument fails because the decision, as accurately read, does decide Bucher's declaration of interest claim, and the amended judgment's definition of the location of the Access Easement is consistent with the court's decision of that claim.

¶36 The decision's analysis begins with a section titled "Claims Regarding the Easement and the Use of the Side Yard." This section in turn begins with the circuit court's identification of the "claims" at issue: Bucher's declaration of interest claim as to the definition of the Access Easement, the Shores' adverse possession counterclaims, and the Shores' prescriptive rights counterclaim.

¶37 The circuit court first explains that the Shores' adverse possession counterclaims must be dismissed. The court next turns to the definition of the Access Easement. The court notes that the deed creating the easement defines its purpose, ingress to and egress from the Shore Parcel over the Bucher Parcel, but does not define the path of travel. The court finds that there is no dispute that the Access Easement in the 1959 deed includes the 14-foot-wide path from Fifth Drive through the woods, and that Bucher was asking the court to define the specific path exiting the woods as a 14-foot-wide path along the brush line at the edge of the side yard farthest from the lake. The court then reviews the evidence relating to the historic use of the side yard for access to the Shore Parcel and determines, based on the evidence that it credited, that the Access Easement "for the purpose of ingress and egress includes the entire [s]ide [y]ard." Based on that same evidence, the court also determines that the Shores have "prescriptive rights

for use of the entire side yard for purposes of ingress and egress," and not for any other purposes, such as parking.

¶38 The amended judgment describes the location of the Access Easement as including the 14-foot-wide driveway through the wooded portion of the Bucher Parcel and the entire, 85-foot-long and 45-foot-wide, side yard, as determined in the decision. The description in the amended judgment refers to the recorded plat and tax key numbers and to the depiction of the Access Easement by the black outline on an aerial photograph reproduced in the amended judgment.

¶39 We conclude that Bucher fails to show any inconsistency between the decision and the amended judgment. The amended judgment merely provides a more detailed legal description of the location of the Access Easement as determined by the circuit court in its decision. And, the court in its decision determines the location based on the evidence that it credited of the historic use of the Access Easement. Thus, the court in its decision does decide Bucher's declaration of interest claim requesting a definition of the Access Easement.

¶40 Bucher appears to assert that the circuit court's decision encompasses only the Shores' prescriptive rights counterclaim, but this assertion lacks support in the record. As explained above, in the section of the decision entitled "Claims Regarding the Easement and the Use of the Side Yard," the court specifically addresses both Bucher's declaration of interest claim and the Shores' prescriptive rights counterclaim.

¶41 In sum on this issue, Bucher's argument that we should disregard the amended judgment as misrepresenting the decision fails because, to the extent that we understand it, it is based on an inaccurate reading of those documents.

16

## II. Declaring that the Access Easement Includes the Entire Side Yard

¶42     Bucher argues that the circuit court erred in determining that the Access Easement includes the entire side yard because an easement cannot be declared over an entire tract of land, the location of an easement is determined by the area actually used for access, and the circuit court cannot change the location established by use.[3]     Bucher provides no cites to the record or the decision to support this argument, for good reason.  As stated, the court declared the Access Easement only over the portion of the Bucher Parcel that was actually used for access, as established by the evidence regarding the area that was historically used for access.

¶43     Bucher asserts that the circuit court implicitly concluded that a path "along the [b]rush [l]ine reasonably and conveniently fulfilled the purpose of" the Access Easement.  However, the citation he provides to support this assertion establishes the contrary.  He cites page 9 of the court's decision, which states, "As described above, the court finds that the area of the easement shall be defined as the entire clearing as of the date of the trial referred to as the 'Side Yard.'"  The court goes on to limit any improvement by the Shores to a 14-foot-wide path along the brush line.  These provisions in the decision are consistent with the trial testimony credited by the court that the path along the brush line sufficed to provide access to the Shore Parcel except when wet conditions along the brush line required that other portions of the side yard be used to access the Shore

---

[3] We note that this argument appears inconsistent with Bucher's first argument, which we have rejected above, that the circuit court did not in its decision decide his declaration of interest claim as to the location of the Access Easement.  Regardless of any inconsistencies among Bucher's arguments, we address them as presented on appeal, as alternative arguments of circuit court error.

Parcel. These provisions reflect the court's reasonable inference from that evidence that those other portions will no longer need to be used if the portion along the brush line is improved to alleviate the wet conditions.

¶44 Bucher argues that none of this evidence matters because the easement holder may not "travel all willy-nilly over a tract of land in various courses and directions," citing 25 AM. JUR. 2D *Easements and Licenses* § 41; nor may the circuit court unilaterally change an easement's location based on changing needs, citing **Guse v. Flohr**, 195 Wis. 139, 147, 217 N.W. 730 (1928), and **AKG Real Estate**, 296 Wis. 2d 1, ¶¶31, 39. Regardless of whether the cited authority supports whatever legal proposition Bucher means to make, his argument is based on facts that do not exist here. The court neither changed the location of the Access Easement nor allowed the Shores to travel anywhere they wished on the Bucher Parcel. Rather, the court allowed the Shores to travel only on the dirt driveway and the side yard, as the evidence credited by the court established those portions of the Bucher Parcel have been historically used, to access the Shore Parcel.

¶45 We conclude that the circuit court did not act arbitrarily in locating the Access Easement as it did. The court viewed the parties' parcels and identified the testimony that it credited concerning historical use of the Bucher Parcel to access the Shore Parcel before determining the Access Easement's location. In locating the Access Easement on the entire side yard, the court balanced both the Shores' right to an access easement and Bucher's rights as owner of the Bucher Parcel. Bucher fails to show that the court erroneously exercised its discretion in determining the location of the Access Easement.

18

### III. Other Arguments Regarding Bucher's Declaration of Interest Claim

¶46    Bucher argues that the circuit court erred when it "refused" to decide his declaration of interest claim and to enter judgment declaring the interests of the parties. Alternatively, he argues that, based on purportedly unrefuted facts, he was entitled to judgment declaring the location of the Access Easement as a 14-foot-wide path along the brush line at the end of the side yard farthest from the lake.

¶47    We have already rejected Bucher's first argument in section I. above. To repeat, the circuit court did in both its decision and amended judgment declare the interests of the parties with respect to the Access Easement.

¶48    We have also essentially rejected Bucher's second argument in section II. To the extent that Bucher reframes that argument in a different way that matters, it fails because it relies on testimony that was either discredited by the circuit court or determined to be outweighed by the testimony that the court did credit, asks this court to weigh the testimony differently, and fails to show that the court erroneously exercised its discretion based on the evidence in the record.

¶49    The circuit court credited the testimony, summarized above, by Gondek, Austin, Maurer, John Shore, and Paige Shore, that since at least 1990 vehicles did not routinely follow the brush line but drove across the side yard toward the steps of the cottage or closer to the lake depending on the water conditions on the side yard, when it was too wet to drive by the brush line or on other portions of the side yard. Killian also testified that she saw one vehicle cross the side yard about two car lengths from the brush line. From this testimony, which the court credited, the court found that vehicles used the entire side yard to access the Shore Parcel.

¶50    Bucher fails to show that the circuit court's finding based on this testimony is clearly erroneous.   He cites testimony of Ida Bucher (Bucher's mother) and David Wright (who sold the Bucher Parcel to Bucher) as to the use of the Access Easement before 1990.   As summarized above, Ida testified that vehicles always followed the brush line when accessing the Shore Parcel, but the court noted the large number of leading questions during her testimony, and Ida repeatedly commented about her lack of memory.  Bucher fails to show that it was unreasonable for the court to implicitly weigh the testimony of others, cited above, more heavily.   Wright visited the Shore Parcel as a child in the 1960s to mid-1970s when the cottage steps were in a different location facing the brush line, and thereafter as an adult only two or three times a year.  Bucher fails to show that it was unreasonable for the court also to give little weight to this testimony in light of the testimony by others cited above.

¶51    Bucher cites isolated parts of testimony by Gondek and Austin that he asserts corroborates Ida's and Wright's testimony, but he ignores their testimony summarized above that supports the circuit court's findings as to the use of the side yard necessary to fulfill the Access Easement's purpose of access to and from the Shore Parcel.  *See* ***Hunter***, 229 Wis. 2d at 719 (an access easement "necessarily implies the right to create and maintain a suitable access way").  More generally, to the extent that there may be some contrary evidence to support Bucher's argument, the presence of such evidence is not a reason to overturn the court's factual findings.  Rather, the evidence in support of a contrary finding must in itself constitute the great weight and clear preponderance of the evidence.  ***Cogswell v. Robertshaw Controls Co.***, 87 Wis. 2d 243, 249-50, 274 N.W.2d 647 (1979).  As explained above, the evidence supports the court's findings here.

¶52     In sum on this issue, Bucher fails to show that the circuit court failed to enter judgment on his declaration of interest claim or that the judgment that the court did enter—declaring the Access Easement to include the dirt driveway and entire side yard—was clearly erroneous for being "against the great weight and clear preponderance of the evidence." *See **Royster-Clark, Inc.***, 290 Wis. 2d 264, ¶12; ***Spencer***, 301 Wis. 2d 521, ¶13.

### IV.  The Shores' Prescriptive Rights Counterclaim

¶53     Bucher argues that the circuit court erred in determining that the Shores had prescriptive rights over the entire side yard, consistent with the court's determination of the location of the Access Easement.  Bucher's argument appears to distill down to the proposition that the Shores did not prove a specific line of travel different from the line of travel along the brush line that Bucher argues constituted the Access Easement; therefore, the court erred in determining that the Shores had prescriptive rights coextensive with the Access Easement as defined by the court.  We reject this argument for at least the following reasons.

¶54     To the extent that Bucher's argument appears to be directed at the circuit court's determination that the Access Easement includes the entire side yard, it disregards the undisputed fact that precipitated this dispute—that the 1959 deed confers an express Access Easement over the Bucher Parcel from Fifth Drive to the Shore Parcel, but does not define the specific location of that Access Easement.  Thus, the cases that Bucher cites pertaining to prescriptive easements, and to situations in which an easement holder deviated from the use, location, or dimensions specified in an express easement, do not apply here.  Similarly, his argument that the Shores did not establish a line of travel "at variance with the

original way" fails because the original way here was undefined and what the Shores did establish is a path of travel based on historical use.

¶55 Because the express Access Easement does not specify the location of the Access Easement, the circuit court had the authority to and did define the location of the Access Easement to include the entire side yard, based on the testimony the court credited as to its historical use. *See Werkowski*, 30 Wis. 2d at 417 ("'If a location is not selected by either the servient or the dominant owner and they cannot agree upon a location, a court of equity has the power affirmatively and specifically to determine the location of the servitude.'" (quoted source omitted)); *Jorgenson v. Northern States Power Co.*, 60 Wis. 2d 29, 35, 208 N.W.2d 323 (1973) ("'There is no surer way to find out what parties meant, than to see what they have done.'" (quoted source omitted)). As we have explained, Bucher fails to show that the court erred, based on the testimony it credited, in defining the location of the Access Easement to include the entire side yard.

¶56 To the extent that Bucher's argument is directed at the circuit court's determination, based on the same testimony, that the Shores had established prescriptive rights to the Access Easement as so defined, we do not address it because our affirming the court's decision on Bucher's declaration of interest claim—determining the location of the Access Easement to include the entire side yard—is dispositive. That is, regardless of whether the court properly or improperly decided the Shores' prescriptive rights counterclaim, the Shores have use of the entire side yard under the Access Easement granted by deed, as determined by the court in its decision on Bucher's declaration of interest claim.

## V.  Bucher's Trespass Claim

¶57    Bucher argues that the circuit court erred in dismissing his trespass claim, which was directed at the Shores parking on the side yard of the Bucher Parcel.  His argument fails because he does not show that the circuit court's finding that he induced the parking on the side yard is clearly erroneous.

¶58    "When an easement holder contravenes the terms of an express easement, such contravention may result in a trespass on the servient estate owner's property."  *Grygiel v. Monches Fish & Game Club, Inc.*, 2010 WI 93, ¶40, 328 Wis. 2d 436, 787 N.W.2d 6.  If the property owner "induces the conduct of the alleged trespasser, the trespasser may have a defense."  *Id.*, ¶54 (Abrahamson, C.J., concurring in part and dissenting in part) (citing RESTATEMENT (SECOND) OF TORTS § 164 cmt. b (1965)).

¶59    Section 164 of the Restatement (Second) of Torts states:

> One who intentionally enters land in the possession of another is subject to liability to the possessor of the land as a trespasser, although [the actor] acts under a mistaken belief of law or fact, however reasonable, not induced by the conduct of the possessor, that [the actor] (a) is in possession of the land or entitled to it, or (b) has the consent of the possessor or of a third person who has the power to give consent on the possessor's behalf, or (c) has some other privilege to enter or remain on the land.

Comment a. to this section states that "it is immaterial" that the mistake of possession, consent, or privilege is reasonable, "[u]nless the actor's mistake was induced by the conduct of the possessor."  Comment b. to this section states, "The actor is not liable for a merely harmless intrusion on land under a mistake induced by the conduct of the possessor."

23

¶60   The Shores state, and Bucher does not dispute, that whether the possessor's conduct has induced a mistake under which the actor has intruded on the possessor's land is a question of fact, citing ***Hofflander v. St. Catherine's Hospital, Inc.***, 2003 WI 77, ¶109 n.37, 262 Wis. 2d 539, 664 N.W.2d 545 (whether a party had implied consent to enter another's property is a question to be resolved by the fact-finder).

¶61   Here, the circuit court found that the Access Easement authorized only ingress and egress through the Bucher Parcel, and not parking on it. The court also found that the Shores parked on the side yard only when Bucher placed the obstructions. The court further found that Bucher had placed those obstructions—fencing, metal stakes, orange lines, and a row of arborvitae—in order to force the Shores to travel along the brush line, but that the Shores parked on the side yard because those obstructions made it impossible for the Shores to drive to and park by their cottage as they did when there were no obstructions. That is, the court found that Bucher, in placing the obstructions, gave the Shores no other way of exercising their legitimate rights over the Access Easement. In finding that Bucher had in placing these obstructions induced the Shores to park on the side yard, the court also implicitly found that Bucher had, by this conduct, induced the Shores to mistakenly believe that Bucher consented to the Shores parking on the side yard, thereby establishing a defense to his trespass claim and requiring that it be dismissed.

¶62   Bucher argues that the Shores failed to prove that they parked on the side yard because the obstructions induced them to mistakenly believe that Bucher consented to their doing so. However, John Shore's testimony credited by the circuit court established that the obstructions made it impossible for the Shores to drive around the obstructions along the brush line when the side yard was wet, or

to drive along the brush line and maneuver their vehicles so that they could park facing their cottage as they typically did. John Shore also testified that they understood the obstructions to mean "not to cross." Taken together, this testimony reasonably supports the court's explicit and implicit findings that, by leaving the Shores no option but to park on the side yard behind the obstructions, Bucher was through the obstructions inducing the Shores to mistakenly believe that he consented to them parking behind the obstructions so long as the obstructions were there.

¶63   Bucher counters that John Shore also testified, as asserted by Bucher, that "the Shores knew they did not have Bucher's consent to park on the [side yard]." But in the portion of the testimony cited by Bucher, John Shore testified more completely that "Bucher was challenging every aspect of [the Shores'] use of that property, parking, driving, and otherwise." Bucher fails to show that the circuit court's implicit finding—that, even as Bucher was "challenging" the Shores' use of the side yard, Bucher was, by leaving the Shores no other options to maneuver their vehicles so as to park by their cottage, inducing them to mistakenly believe that he consented to them parking behind the obstructions—is against the great weight and clear preponderance of the evidence. Accordingly, Bucher fails to show that the court erred in dismissing his trespass claim based on the defense of inducement.

## VI.  The Shores' Nuisance Counterclaim

¶64   Bucher argues that the circuit court erred in six respects in granting judgment to the Shores on their nuisance counterclaim. We first summarize the applicable legal principles and then address and reject his arguments in turn.

¶65    A right-of-way easement conveys the right to pass over the land; title to the land remains with the owner. *Kleih v. Van Schoyck*, 250 Wis. 413, 418, 27 N.W.2d 490 (1947). "An owner of property subject to an easement may make all proper use of the land, including the right to make changes in or upon it, but the owner may not unreasonably interfere with the use by the easement holder." *Figliuzzi*, 184 Wis. 2d at 588. The unreasonable obstruction or disturbance of an easement is anything that wrongfully interferes with the holder's right to use the easement for the purpose for which it was created, by making its use less convenient and beneficial than before. *Hunter v. McDonald*, 78 Wis. 2d 338, 344, 254 N.W.2d 282 (1977). Such unreasonable obstructions or disturbances are unauthorized and constitute nuisances. *Id.*; *see also Enz v. Duke Energy Renewable Servs., Inc.*, 2023 WI App 24, ¶¶56, 60, 407 Wis. 2d 728, 991 N.W.2d 423 (to prove an intentional private nuisance based on the interference with the use and enjoyment of land, the conduct must be unreasonable).

¶66    "The question of unreasonable interference is a mixed question of fact and law." *Figliuzzi*, 184 Wis. 2d at 588. The circuit court must make a factual determination as to what the property owner is doing with the land and a legal determination of whether that conduct constitutes an unreasonable interference with the easement holder's use of the easement. *Id.* at 589. "This court will uphold the factual determinations underlying the legal conclusion unless they are clearly erroneous." *Id.* "[B]ecause a circuit court's conclusion on reasonableness is intertwined with the factual findings supporting that conclusion, this court gives weight to a circuit court's finding of reasonableness." *Id.* at 590.

*A. Bucher's interference with the Shores' Access Easement rights as a basis for judgment on the Shores' nuisance counterclaim*

¶67    Bucher argues that the circuit court erred in determining that his conduct unreasonably interfered with the Shores' Access Easement rights, and in relying on that conduct as a basis for granting judgment on their nuisance counterclaim.

¶68    As stated, the circuit court found that Bucher's obstructions—fence, orange line, metal stakes, and row of arborvitae—unreasonably interfered with the Shores' use of the easement for its stated purpose—access to the Shore Parcel. And, we have concluded that these findings of fact are not clearly erroneous. Under the law summarized above, such a result unreasonably interfered with the use of the easement for its stated purpose and, consequently, constituted a nuisance. Bucher's arguments to the contrary fail because they disregard the court's factual findings and the testimony, all described above, supporting those findings.

¶69    Bucher argues that none of his obstructions interfered with the Shores' use of the Access Easement "because there was adequate space left for vehicular travel to and from the Shore Parcel." Bucher cites John Shore's testimony that the space between one of Bucher's stakes and the brush line was sufficient for a car to pass through. However, this isolated testimony ignores the other testimony summarized above that supported the circuit court's finding that the stakes together with the fence and arborvitae prevented the Shores from driving to and from the Shore Parcel and maneuvering so that they could park by the steps to their cottage.

¶70    Bucher also cites John Shore's testimony that, "what's notable is that all the time we've owned the property, [Bucher]'s never put anything into our actual easement area. He's always respected that." However, Bucher takes that testimony out of context. John Shore specified that Bucher did not put his "pier, his boat trailers, or any of those things, into the [side yard] in off season." This testimony did not address the effect of the fence, stakes, and arborvitae on the Shores' access to the Shore Parcel.

¶71    Bucher argues that the fact that the path of travel between the arborvitae and the brush line was at times too wet to use is irrelevant because a trial exhibit shows that when that path was wet most of the side yard was also "substantially" as wet. However, Bucher cites no testimony explaining this exhibit. Moreover, the circuit court credited the testimony described above that the area of the side yard closest to the lake was dry enough to travel on when the area by the brush line was too wet to use, and that the Shores and their predecessors drove over whatever part of the side yard was driest when the area by the brush line was too wet to use.

¶72    Bucher fails to show that the circuit court erred in determining that his conduct unreasonably interfered with the Shores' Access Easement rights, and in relying on that conduct as a basis for granting judgment on their nuisance counterclaim.

### B. Bucher's installation of surveillance cameras as a basis for judgment on the Shores' nuisance counterclaim

¶73    Bucher argues that the circuit court erred in relying on his installation of surveillance cameras as a basis for granting judgment on the Shores' nuisance counterclaim. Specifically, he argues that the court's finding that one of

the cameras "looked directly into the Shores' bedroom" was clearly erroneous, because it was based on Paige Shore's testimony that the camera pointed directly into the Shores' bedroom, but there was no testimony by Paige Shore or anyone else that the camera could show the interior of the bedroom. However, this argument misfires because it disregards the court's finding that all of the cameras, including the camera that directly faced the Shores' cottage—and that was installed "extremely close to" the Shores' property line—regardless of what they actually showed, were "clear[ly] … meant to monitor the activities of the Shores," so as to unreasonably interfere with the Shores' enjoyment of their property.

### C. Bucher's encouragement of others to photograph the Shores on their property as a basis for judgment on the Shores' nuisance counterclaim

¶74   Bucher argues that the circuit court erred in finding that Bucher was responsible for the photographing by his family and neighbors of the Shores and their family on the Shores' property. This argument has no factual support.

¶75   The circuit court found that Bucher's "monitoring and harassment," which deprived the Shores of the enjoyment of their property, included the "concerted behavior" by Bucher and his relatives and neighbors to monitor and photograph the Shores and their family on their property. The court further found that this concerted conduct was evidenced by coordinated communication by Bucher with others indicating his "specific thought to both observe what the Shores were doing but also to make it uncomfortable for them."

¶76   Bucher asserts that only 4 of the 38 photographs by Bucher and his relatives and neighbors introduced as evidence at trial showed the Shores or their family. But Bucher does not explain how this fact undermines the circuit court's ruling, and we reject whatever argument he means to make as undeveloped. *See*

*Techworks, LLC v. Wille*, 2009 WI App 101, ¶27, 318 Wis. 2d 488, 770 N.W.2d 727 (we are not required to entertain undeveloped arguments).

¶77    Bucher also asserts that all of the photographs of the Shores were taken while they were outside their cottage "and not where the Shores would have had a reasonable expectation of privacy." Bucher neither supports this assertion with relevant legal authority nor explains how, even if legally accurate, this fact undermines the circuit court's ruling, and we reject whatever argument he means to make as both unsupported by legal authority and undeveloped. *See Borsellino v. DNR*, 2000 WI App 27, ¶11, 232 Wis. 2d 430, 606 N.W.2d 255 (we need not consider arguments unsupported by reference to legal authority); *ABKA Ltd. P'ship v. Board of Rev.*, 231 Wis. 2d 328, 349 n.9, 603 N.W.2d 217 (1999) (we need not address undeveloped arguments).

¶78    Bucher also asserts that that the evidence that he asked his relatives and neighbors to photograph the Shores does not prove that he did so in order to unreasonably interfere with the Shores' enjoyment of their property, because the photographs showed "conditions and actions directly relevant to [this] lawsuit." This assertion is also unsupported by relevant legal authority and ignores the evidence relied on by the circuit court in finding the relatives' and neighbors' conduct to be "coordinated" by Bucher as part of Bucher's concerted efforts, together with his surveillance cameras and obstructions, to make it uncomfortable for the Shores to be on their property. That Bucher also found the photographs useful in this litigation does not show that the court's finding—that Bucher's efforts in coordinating the taking of the photographs were part of his "monitoring and harassment" that deprived the Shores of the enjoyment of their property—was clearly erroneous.

### D. Whether Bucher caused substantial harm to the Shores

¶79    Bucher argues that the Shores failed to show that his conduct caused them substantial harm because the Shores failed to introduce evidence of the standards in the community. Alternatively, Bucher argues that the evidence showed that Bucher's conduct was equivalent to the Shores' conduct and, therefore, conformed to such standards. These arguments are not supported by the law that Bucher cites or the record.

¶80    "The focus in determining whether a particular nuisance is actionable depends on whether the interference with the use and enjoyment of land is unreasonable and substantial." *Krueger v. Mitchell*, 112 Wis. 2d 88, 107, 332 N.W.2d 733 (1983). "Whether the injuries claimed in a particular action are substantial depends on the particular facts in light of the effect [that] the complained of activity would have on a person of ordinary sensibilities." *Id.* at 108.

¶81    Here, the circuit court declared judgment for the Shores on their nuisance counterclaim based on Bucher's placement of obstructions that unreasonably interfered with the Shores' use of the Access Easement on the Bucher Parcel, as well as on Bucher's concerted efforts through monitoring and harassment to interfere with the Shores' use and enjoyment of the Shore Parcel. With one exception addressed at the end of this section, Bucher does not address his unreasonable interference with the Shores' use of the Access Easement or argue that the evidence presented at trial did not suffice to prove that such unreasonable interference caused the Shores substantial harm. Rather, he focuses only on the monitoring and harassment aspects of the Shores' nuisance counterclaim.

¶82 As to those aspects, Bucher argues that the Shores did not introduce evidence of the standards of the locality through testimony of members of the community, and that their own testimony did not suffice. Bucher cites the following language in *Krueger*, 112 Wis. 2d at 107 (quoting RESTATEMENT (SECOND) OF TORTS § 821F cmt. d): "The standard for the determination of [whether the harm is substantial] is the standard of normal persons or property in the particular locality." However, he cites no legal authority supporting the proposition that the Shores were required in this private nuisance case to call community members to testify about community standards regarding the harms that the Shores testified Bucher caused them. Nor does he develop an argument explaining in what respects the effects on the Shores and their family of Bucher's monitoring and harassing conduct, as described in the Shores' testimony, would not be experienced by "a person of ordinary sensibilities." *See Krueger*, 112 Wis. 2d at 108. Accordingly, we reject Bucher's argument as unsupported by legal authority and undeveloped.

¶83 Alternatively, Bucher argues that his monitoring and harassing conduct did not cause the Shores substantial harm because "the Shores' own actions were almost identical to [his] actions." The circuit court's findings refute this argument.

¶84 Regarding the use of surveillance cameras, Bucher notes that he installed his cameras on the Bucher Parcel only after the Shores installed two cameras on the Shore Parcel. However, the circuit court found that the Shores pointed their cameras out from the Shore Parcel in response to a perceived act of vandalism on their property, and it was unclear whether the cameras could show Bucher's house on property that was located on the other side of the Bucher Parcel. In contrast, the court found that Bucher, driven by malice towards the

Shores, installed at least one of his cameras extremely close to the Shores' property line, pointed directly at the bedroom in the Shores' cottage, in order to monitor the Shores' activities.

¶85     Regarding "confrontations" between the parties, Bucher notes that in two of the instances of disputes between Bucher and John Shore, John Shore approached Bucher.  While the circuit court found that there was testimony about "heated disputes" involving both men, the court also found that "the level of concerted behavior by Bucher and his family" was significantly different from any conduct by the Shores.

¶86     Lastly, Bucher addresses the obstructions that he placed, which the circuit court found unreasonably interfered with the Shores' use of the Access Easement.  Bucher argues that these obstructions did not cause significant harm because he placed them to protect his property rights, while the Shores parked on his property to protect their claimed prescriptive right to do so.  However, as explained above, the court rejected this argument in the course of dismissing Bucher's trespass claim, finding that Bucher's obstructions induced the parking by the Shores.

### E.  Bucher's intent to cause a nuisance

¶87     Bucher argues that, while he "knew that he was interfering with the interests the Shores claimed in the Bucher Parcel, there was no evidence that Bucher knew he was harming the Shores' interest in the use and enjoyment of the Shore Parcel."  Bucher's argument fails because the circuit court found that his conduct—directed at the Shores' interests in both the Bucher Parcel and the Shore Parcel—was based on malice, requiring only that he intended to cause the interference and not that he also knew that his conduct caused the harm.

¶88 "[A] nuisance is based on intentional conduct when the [wrongdoer], through ill will or malice, intends to cause the interference or if the [wrongdoer], without any desire to cause harm, nonetheless has knowledge that [the wrongdoer's] otherwise legal enterprise is causing harm or is substantially certain to cause the invasion at issue." *Milwaukee Metro. Sewerage Dist. v. City of Milwaukee*, 2005 WI 8, ¶37, 277 Wis. 2d 635, 691 N.W.2d 658; *see also Enz*, 407 Wis. 2d 728, ¶56 ("Intentional conduct results if the [wrongdoer] (a) acts for the purpose of causing the nuisance; or (b) if the [wrongdoer] knows that the nuisance is resulting or is substantially certain to result from the [wrongdoer's] conduct."). Our supreme court has ruled that "the 'knowledge' requirement refers to knowledge that the condition or activity is causing harm to another's interest in the use and enjoyment of land" only "when a nuisance is alleged to fall under the second category of intentional conduct." *Milwaukee Metro. Sewerage Dist.*, 277 Wis. 2d 635, ¶38.

¶89 Here, the circuit court found that Bucher acted out of malice to unreasonably interfere with the Shores' use of the Access Easement over the Bucher Parcel and with their use and enjoyment of the Shore Parcel. Bucher cites a few isolated portions of trial testimony that he asserts refute a finding that he acted out of malice as to the Shores' interest in the Shore Parcel, but he does not show that the court's finding—that he acted out of malice as to the Shores' interests in both parcels—is against the great weight and clear preponderance of the evidence. Accordingly, knowledge that his conduct would cause harm to the Shores' interest in the use and enjoyment of their land was not required. *See id.*

34

*F. Whether Bucher's conduct was privileged*

¶90    Bucher argues that he placed the stakes, orange line, fence, and arborvitae, and installed the surveillance cameras, in exercising his right to protect his property from trespass.  Accordingly, his argument continues, his conduct was privileged and not unreasonable as a matter of law.  However, the little case law that he cites to support this argument neither privileges unreasonable conduct nor addresses the rights regarding easements.[4]  Indeed, the one case that Bucher cites regarding express easements reiterates the well-established legal rule that the owner of the servient estate (here, Bucher) may properly use the owner's land "as long as [the owner] does not unreasonably interfere with the easement holder's use of the land."  *See **Garrett v. O'Dowd***, 2009 WI App 146, ¶7, 321 Wis. 2d 535, 775 N.W.2d 549.    We have already rejected Bucher's arguments that he did not unreasonably interfere with either the Shores' use of the Access Easement or their use and enjoyment of the Shore Parcel.  Because the circuit court's findings that his conduct in both respects was unreasonable and inspired by malice, his argument based on privilege has no basis in the record or the law.

## VII.  Award of Punitive Damages

¶91    Bucher argues that the Shores did not establish that Bucher's privileged conduct was inspired by the actual malice that is required for an award

---

[4] We cite one example of what appears to be a misleading citation in Bucher's argument. He states, "In the context of easements, the owner of the servient estate has the 'right to exclude others from his or her land' to protect 'his or her land from trespass.'"  He cites ***Jacque v. Steenberg Homes, Inc.***, 209 Wis. 2d 605, 617-18, 563 N.W.2d 154 (1997).  However, there is no language in that case addressing easements, and the case involves the availability of punitive damages for an intentional trespass by a company that plowed a path through the Jacques' property to deliver a mobile home to a neighbor.  ***Id.*** at 609.  We remind counsel that good appellate advocacy requires complete candor to the court.

of punitive damages. We reject this argument for the same reasons that we have rejected his arguments that his conduct was privileged and that the evidence failed to show that he acted intentionally and with malice.

¶92 Punitive damages "'are designed to hurt in order to punish and to deter.'" *Tucker v. Marcus*, 142 Wis. 2d 425, 436-37, 418 N.W.2d 818 (1988) (quoted source omitted). "The foundation for a punitive damage award is proof of outrageous conduct by the wrongdoer." *Gianoli v. Pfleiderer*, 209 Wis. 2d 509, 527, 563 N.W.2d 562 (Ct. App. 1997). When the circuit court acts as the trier of fact, the decision to award punitive damages is within the court's discretion. *Id.* at 531. "We will not overturn a punitive damages award if there is any credible evidence in the record to support it." *Id.* at 527.

¶93 Punitive damages are governed by WIS. STAT. § 895.043. Under this statute, punitive damages may be awarded "if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." § 895.043(3). An act is "malicious" if it is "'the result of hatred, ill will, a desire for revenge, or inflicted under circumstances where insult or injury is intended.'" *Strenke v. Hogner*, 2005 WI 25, ¶26, 279 Wis. 2d 52, 694 N.W.2d 296 (quoted sources omitted).

¶94 We have previously described Bucher's conduct. The circuit court found this conduct to be a concerted effort by Bucher, through his own actions and his encouragement of his family and neighbors, to wrongfully interfere with the Shores' use of the Access Easement and with their use and enjoyment of the Shore Parcel. The court found that Bucher's description of the Shores as "the enemy" in his text messages to a neighbor, along with other aspects of his communications, showed "a specific thought … to make it uncomfortable for [the Shores]." The

court found that Bucher's own testimony showed that Bucher acted with malice and that, through his monitoring and harassment, he took the Shores' enjoyment of their property away from them. The court found, "given the nature of the actions and the extended period of time they were conducted, that this interference has been extreme and outrageous."

¶95 As stated, Bucher argues that his conduct was privileged, and that there was no evidence "that Bucher acted with bad or corrupt motives against the Shores." Bucher again points to a few isolated portions of the testimony that he asserts showed that he acted only to protect his property rights. We have already rejected Bucher's argument that his conduct was privileged. We reject the remaining part of his argument against the punitive damages award because he fails to show that the circuit court's finding that his conduct was outrageous was clearly erroneous.

¶96 In sum on this issue, Bucher fails to show that the circuit court erroneously exercised its discretion in awarding punitive damages.

## VIII. Amount of Punitive Damages Award

¶97 Bucher argues that the amount of the punitive damages award, $200,000, is constitutionally excessive. We conclude that the amount of the punitive damages award is reasonable under the facts of this case.

¶98 Regarding compensatory damages, the circuit court stated, "The actual compensatory damages that have been suffered by the Shores are difficult to quantify." However, the court explained, "the lost ability to use their property in the fashion or in the amount that they would normally have done so does need to be compensated." Based on all of the facts of the case (which we address in

greater detail below), the court determined that a compensatory damages award of $20,000 was appropriate, along with a $200,000 award of punitive damages.[5]

¶99   "The due process clause of the Fourteenth Amendment imposes substantive limits on the size of punitive damage awards." *Gianoli*, 209 Wis. 2d at 528.  "A punitive damages award is excessive and therefore unconstitutional if it is more than is necessary to serve the purposes of punitive damages, or inflicts a penalty or burden on the defendant that is disproportionate to the wrongdoing." *Id.* at 529.  "The purpose of punitive damages is to punish the wrongdoer and to deter the wrongdoer and others from similar conduct…." *Management Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 193, 557 N.W.2d 67 (1996).  "[A] reviewing court must consider the reasonableness of punitive damages on a case-by-case basis, considering the relevant circumstances in each particular case." *Id.* at 194.

¶100   Courts should consider six factors in determining whether an award of punitive damages is constitutionally excessive: "the grievousness of the acts, the degree of malicious intent, whether the award bears a reasonable relationship to the award of compensatory damages, the potential damage that might have been caused by the acts, the ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct, and the wealth of the wrongdoer." *Id.* Our supreme court has rejected "the notion that courts can use a multiplier, or fixed ratio of compensatory-to-punitive damages or criminal fines-to-punitive damages, to calculate the amount of reasonable punitive damages." *Id.*

---

[5] As noted in the background above, the circuit court initially awarded $250,000 in punitive damages but, on Bucher's motion for reconsideration, reduced the award to $200,000 consistent with the limitation in WIS. STAT. § 895.043(6).

¶101 We conclude that the first two factors—the grievousness of the acts and the degree of malicious intent—weigh in favor of the circuit court's punitive damages award. The high degree of reprehensibility is manifest in light of the court's findings regarding Bucher's conduct. As recounted above, the court found that Bucher's conduct "was extreme and outrageous" and took place over an "extended period of time," and that the degree of his malicious intent was "high."

¶102 Bucher argues that he caused no physical or economic harm and used the "safest and least offensive means of protecting his property." However, he provides no evidentiary support for this argument and disregards the extreme nature of the harm that the circuit court found he did cause—in the words of the court, "[t]he Shores' enjoyment of their property has been taken from them." The Shores testified, and the court found, that they do not feel safe there and their children do not want to be there. The court further found, based on the obstructions that Bucher placed and the monitoring and harassment that he orchestrated, that "it is clear based on the evidence presented that Bucher's intention was to make the Shores so uncomfortable that they either agreed to move the easement or otherwise sell." Bucher's attempts to minimize or justify his conduct fall flat on this record.

¶103 As to the next two factors, we conclude, for the reasons already stated, that the punitive damages award is reasonably related to the award of compensatory damages and to the damage caused by Bucher's conduct. Bucher asserts that WIS. STAT. § 895.043(6) "implies that a 2:1 ratio is appropriate," but he fails to develop an argument that such a ratio is appropriate based on the facts of this case. First, there is no such implication in § 895.043(6), which permits punitive damages up to $200,000, regardless of the ratio between compensatory and punitive damages. Second, Bucher fails to explain why the 10:1 ratio here is

unreasonable, or to address cases in which Wisconsin courts have affirmed awards of punitive damages that are at least ten times the awards of compensatory damages. *See Gianoli*, 209 Wis. 2d at 519-21, 526, 531 (affirming award of compensatory damages of $12,000 and punitive damages of $200,000 in a property dispute for the defendant's acts of obstruction, surveillance, and harassment); *Management Computer Servs.*, 206 Wis. 2d at 195-96 (approving punitive damages award of $650,000, which was ten times the $65,000 awarded as compensatory damages).

¶104  As to the next factor, we consider comparative civil and criminal penalties. We observe that the statutes cited by the parties related to invasion of privacy are most apt. The criminal statute cited by Bucher penalizes the installation or use of a surveillance device in a private place with the intent to observe a nude or partially nude person as a Class A misdemeanor, subject to a maximum fine of $10,000 and a maximum jail term of nine months. *See* WIS. STAT. §§ 942.08(2), 939.51(3)(a). The civil statute cited by the Shores provides for relief for the intrusion of privacy of a highly offensive nature in a private place or in a manner that is actionable for trespass, including compensatory damages not limited to pecuniary loss and reasonable attorney fees. *See* WIS. STAT. § 995.50(1)(c), (4). We conclude that these comparative penalties do not render the punitive damages award here excessive.

¶105  As to the last factor, the wealth of the wrongdoer, the evidence at trial established, and the circuit court found, that Bucher earns an annual salary of approximately $200,000 and owns other property on Wood Lake and a condominium in Alabama. Bucher argues that the award, which equals his salary, is excessive given the nature of the injuries to the Shores and the privileged nature of his conduct. However, we have already explained why the injuries to the

Shores were substantial and why his conduct was not privileged. Bucher fails to show that his wealth renders the punitive damages award excessive.

¶106 Having considered all of the factors, we conclude that the amount of the punitive damages award is not excessive and does not violate constitutional limitations.

## CONCLUSION

¶107 For the reasons stated, we affirm.

*By the Court.*—Judgment affirmed.

This opinion is not recommended for publication in the official reports.